UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                              )
JODY LEE JOHNSON,             )
                              )
     Plaintiff,               )
                              )
     v.                       )      C.A. No. 21-433 WES
                              )
PATRICIA A. COYNE-FAGUE,      )
                              )
     Defendant.               )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, United States District Judge.

Before the Court is Defendant Patricia A. Coyne-Fague's ("State") Motion to Dismiss, ECF No. 21, Jody Lee Johnson's Second Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus, ECF No. 19 ("Second Amended Petition"). In his Second Amended Petition, Johnson asserts that he was deprived of his right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and that his due process rights under the Fifth and Fourteenth Amendments were violated when the State withheld exculpatory information. Second Am. Pet. at 5, 8.[1] The State argues that Johnson's Second Amended Petition should be dismissed because he cannot sustain a claim for relief under 28 U.S.C. § 2254. Mem. Supp. Mot. to

_____

[1] Page numbers reflect the pagination generated by the Court's Electronic Filing System ("ECF").

Dismiss ("State's Mem.") 3, 8, ECF No. 21.  The Court has determined that no hearing is necessary.[2]  For the reasons that follow, the State's Motion to Dismiss is GRANTED and the Petition is DISMISSED.

I.   Background and Travel

On the night of January 28, 2014, three people — a tall, muscular, black-skinned man; an approximately ten-year-old boy; and a third person whose face was not visible — entered Mary Celletti's home and robbed her at gunpoint.  State v. Johnson, 199 A.3d 1046, 1048-49 (R.I. 2019).  At trial, Celletti testified that the tall man was wearing dark gray glasses, which had tape on one side holding the arm to the frame; a blue jacket and scarf, which he took off; and a hood, which he pulled down, uncovering his head. Id. at 1049.  Celletti subsequently identified the tall man as Johnson.  Id. at 1050.

Upon entering the home, the tall man told Celletti and the boy to sit and handed the boy the gun.  Id. at 1049.  The boy held the gun on Celletti while the other two intruders carried out the robbery.  Id.  Celletti testified that she talked with the boy, trying to "humanize herself with him" and find out who he was.

_____

[2] "[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." Cullen v. Pinholster, 563 U.S. 170, 183 (2011) (internal quotation marks omitted); see also Jaynes v. Mitchell, 824 F.3d 187, 197 n.2 (1st Cir. 2016).

She learned his name and where he went to school.  Id.  She also asked if he thought they were going to kill her.  Id.  Eventually the three left, after taking a number of items from the home.  Id. As they left, the tall man wiped fingerprints from the gun and told Celletti that if she called the police he would come back. Id.  After they left, Celletti called her daughter and told her that she had just been robbed at gunpoint.  Id.  Celletti's daughter soon arrived, along with the police.  Id.

Johnson was eventually arrested, indicted, and charged with conspiracy to commit first-degree robbery (Count One), first-degree robbery (Count Two), contributing to the delinquency of a minor (Count Three),[3] and assault with a dangerous weapon in a dwelling with intent to commit robbery (Count Four).  Id. at 1048, 1048 n.2.  Following a four-day trial in January of 2017 in Providence County Superior Court, a jury convicted Johnson of all counts.  Id. at 1048, 1050.  The trial justice imposed a sentence of twenty-five years' imprisonment, twelve years to serve, the balance suspended with probation, on Johnson's first-degree robbery and assault with a firearm convictions.  Id. at 1050.  The court originally sentenced Johnson to twenty years' imprisonment, with ten years to serve and ten suspended with probation, on the

---

[3] The State dismissed Count Three after trial when it realized that the Family Court had exclusive jurisdiction over charges brought pursuant to R.I. Gen. Laws § 11-9-4.  Johnson, 199 A.3d at 1048 n.2.

conspiracy conviction.  <u>Id.</u>  However, the court subsequently <u>sua</u> <u>sponte</u> modified the sentence to ten years' imprisonment with ten to serve.  <u>Id.</u>  All sentences were to run concurrently.  <u>Id.</u>

Johnson had filed a motion for judgment of acquittal at the close of the State's evidence, which was denied, and again prior to closing arguments and jury instructions.  <u>Id.</u>  The court reserved decision on the latter motion.  <u>Id.</u>  After the jury returned guilty verdicts on all counts, the trial justice denied the renewed motion for judgment of acquittal as well as Johnson's motion for a new trial.  <u>Id.</u>

Prior to the entry of final judgment, Johnson filed a notice of appeal, but he did not file another notice of appeal after the trial justice corrected the sentence imposed for the conspiracy conviction.  <u>Id.</u>  Johnson then petitioned for a writ of certiorari, which the Rhode Island Supreme Court granted, for direct review of his convictions and denial of his motion for a new trial.  <u>Id.</u>  Johnson challenged the denial of the motion for a new trial, arguing that the verdict was against the weight of the evidence.  <u>Id.</u> at 1051.  Specifically, he argued that the complaining witness's identification of him should have been given little weight.  <u>Id.</u>  Johnson also contended that the weight of the evidence did not indicate that an operable firearm was used in the incident.  <u>Id.</u>  The R.I. Supreme Court rejected both arguments and

affirmed Johnson's judgment of conviction.  Id. at 1053.  Johnson did not seek further review.

Next, Johnson filed an application for post-conviction relief in the trial court.  See Post-Conv. Decision, ECF No. 19-2. Johnson's initial application, filed pro se, asserted five grounds for relief: (1) newly discovered evidence; (2) civil rights violations; (3) malicious prosecution; (4) prosecutorial misconduct; and (5) due process violations.  Id. at 2–3.  Following the appointment of counsel ("post-conviction counsel"), Johnson filed an amended application, which narrowed the grounds to two: (1) ineffective assistance of trial counsel; and (2) due process violations.  Id. at 3.  The court held an evidentiary hearing and, after considering the hearing testimony and the parties' post-hearing submissions, denied Johnson's amended post-conviction application.  Id. at 3, 22.  Johnson filed a petition for a writ of certiorari in the R. I. Supreme Court, but the court denied the petition.  Sup. Ct. Order, ECF No. 19-3.

Johnson then timely filed the instant Petition.  His original petition contained both exhausted and unexhausted claims.  See May 6, 2022, Text Order.  Therefore, pursuant to Rhines v. Weber, 544 U.S. 269 (2005), and Sena v. Kenneway, 997 F.3d 378 (1st Cir. 2021), the Court gave Johnson the option to amend his petition to include only exhausted claims, file a motion to stay the case until all of his claims had been exhausted, or request that the Court

dismiss the petition without prejudice to allow him to present his unexhausted claims to the state courts.  Id.  In addition, the Court appointed counsel for the limited purpose of assisting Johnson in reaching this decision and making the relevant filing. Id.  Johnson chose the first option and, through appointed counsel, filed the instant Second Amended Petition.  In response, the State filed the Motion to Dismiss.

II.  Standard of Review

    A.   Habeas Standard

    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits this Court's review of state convictions and sentences.  Carpio v. Wall, 269 F. Supp. 3d 4, 6 (D.R.I. 2017). Thus, habeas corpus relief serves as a "guard against extreme malfunctions in the state criminal justice systems not a substitute for ordinary error correction through appeal."  Id. (internal quotation marks omitted) (quoting Harrington v. Richter, 562 U.S. 86, 102-03 (2011)).

    When a state court has adjudicated a claim on the merits, a federal court may grant habeas corpus relief only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "[A]n <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Carpio</u>, 269 F. Supp. 3d at 9 (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)) (alteration in original).  An incorrect application is "contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." <u>Hensley v. Roden</u>, 755 F.3d 724, 731 (1st Cir. 2014) (alterations in original) (internal quotation marks omitted).  An unreasonable application occurs "if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Abrante v. St. Amand</u>, 595 F.3d 11, 15 (1st Cir. 2010)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the [U.S. Supreme] Court." <u>DeCiantis v. Wall</u>, 868 F. Supp. 2d 1, 5 (D.R.I.

2012) (alterations in original)(quoting <u>Wetzel v. Lambert</u>, 565 U.S. 520, 523 (2012)), <u>aff'd</u>, 722 F.3d 41 (1st Cir. 2013); <u>see also</u> <u>Norton v. Spencer</u>, 351 F.3d 1, 8 (1st Cir. 2003) ("If it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." (quoting <u>McCambridge v. Hall</u>, 303 F.3d 24, 36 (1st Cir. 2002))).  "The upshot of the AEDPA habeas regime is that 'when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion' . . . 'a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.'" <u>Porter v. Coyne-Fague</u>, 35 F.4th 68, 75 (1st Cir. 2022) (quoting <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018)).[4]  "'[E]valuating whether a rule application was unreasonable requires considering the rule's specificity,' such that '[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  <u>Id.</u> (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  However, "[t]he Supreme Court has recognized that 'even a general standard may be applied in an unreasonable

---

[4] Here, the last state court to decide Johnson's post-conviction application and "explain[] its decision on the merits in a reasoned opinion . . . ," <u>Porter v. Coyne-Fague</u>, 35 F.4th 68, 75 (1st Cir. 2022), is the Rhode Island Superior Court, because the R.I. Supreme Court's order denying certiorari did not address the merits of the claims.

manner.'"  Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018)

(quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007)).

> The second scenario justifying habeas relief is if the
> state court adjudication led to "a decision that was
> based on an unreasonable determination of the facts in
> light of the evidence presented in the State court
> proceeding." 28 U.S.C. § 2254(d)(2).  Though this means
> that a federal court will be taking a closer look at a
> state court's findings of fact, the fundamental
> principle of deference to those findings still applies.

Hensley, 755 F.3d at 731.  "Factual determinations by state courts

are presumed correct absent clear and convincing evidence to the

contrary, § 2254(e)(1), and a decision adjudicated on the merits

in a state court and based on a factual determination will not be

overturned on factual grounds unless objectively unreasonable in

light of the evidence presented in the state-court proceeding, §

2254(d)(2)."[5]  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"This demanding showing cannot be made when '[r]easonable minds

reviewing the record might disagree' about the finding in question.

. . .  That said, '[e]ven in the context of federal habeas,

---

[5] In Miller-El v. Cockrell, the Supreme Court clarified that:

AEDPA does not require petitioner to prove that a
decision is objectively unreasonable by clear and
convincing evidence.  The clear and convincing standard
is found in § 2254(e)(1), but that subsection pertains
only to state-court determination of factual issues,
rather than decisions.  Subsection (d)(2) contains the
unreasonable requirement and applies to the granting of
habeas relief rather than to the granting of a COA.

537 U.S. 322, 341-42 (2003).

deference does not imply abandonment or abdication of judicial review.'" Porter, 35 F.4th at 75 (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)).

    B.   Ineffective Assistance of Counsel Standard

    The standard for analyzing a claim of ineffective assistance of counsel stems from Strickland v. Washington, 466 U.S. 668 (1984), which provides a two-pronged test for evaluating such claims. Kholi v. Wall, CA No. 14-307-JJM, 2015 WL 567148 at *4 (D.R.I. Feb. 10, 2015). Under the "performance prong" of the Strickland test, Johnson must show his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Under the "prejudice prong," Johnson must show that "the deficient performance prejudiced the defense." Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

    Strickland instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential . . . ." Id. at 689; see also id. ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable."). In considering the claim, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

When evaluating ineffective assistance of counsel claims, the Rhode Island Supreme Court employs a standard "identical to the one set forth by the Supreme Court of the United States in Strickland v. Washington." Tassone v. State, 42 A.3d 1277, 1284 (R.I. 2012); see also Brown v. Moran, 534 A.2d 180, 182 (R.I. 1987) (summarizing Strickland standard).

III. Discussion

In his Second Amended Petition Johnson alleges that he received ineffective assistance of counsel based on the failure of trial counsel, James T. McCormick, Esq. ("trial counsel"), (1) to

interview the complaining witness, Mary Celletti, or have an investigator speak with her; and (2) to file a motion to suppress her identification of Johnson, as it was impermissibly suggestive and unreliable.  Second Am. Pet. at 5.  Specifically, he alleges that:

> [T]he Rhode Island Department of Attorney General disclosed to the complaining witness that Jody Johnson was the suspect.  This disclosure occurred after the complaining witness had failed to select Mr. Johnson from a photo array.  Furthermore, the witness provided a limited physical description of her assailant and there was no physical evidence linking Mr. Johnson to the crime.

Id.

Johnson also alleges that the State withheld exculpatory material in violation of Brady v. Maryland, 373 U.S. 83 (1963), and his right to due process guaranteed by the Fifth and Fourteenth Amendments.  Second Am. Pet. at 7.  Johnson argues that Celletti learned Johnson was the suspect from the Attorney General's office and that this information was not disclosed to trial counsel before the trial commenced.  Id.

The State responds that, although Johnson has set forth federal claims in the Second Amended Petition, "he does not address the Superior Court's Decision in any way or suggest how or why he believes the [d]ecision is contrary to, or constitutes an unreasonable application of, clearly established federal law, or how it is based on an unreasonable determination of the facts."

State's Mem. at 11.   Therefore, in the State's view, "Johnson cannot sustain his claims for federal habeas relief."   Id.

A.   Ineffective Assistance of Counsel

The post-conviction court found that Johnson had failed to prove that he received ineffective assistance of counsel.   Post-Conv. Decision at 17.   Thus, the question the Court must answer is:  "Was the [R.I.  Superior] Court's decision . . . so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement?"   White v. Wheeler, 577 U.S. 73, 78-79 (2015) (internal quotation marks omitted); see also Harrington, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.")

As stated above, in deciding Johnson's habeas petition, the role of this Court is limited to deciding whether the state court's application of the Strickland standard was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).   This is not the same question as deciding whether counsel's performance fell below the Strickland standard.   See Harrington, 562 U.S. at 101 ("The pivotal question

is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard."); see also id. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."); Field v. Hallett, 37 F.4th 8, 17 (1st Cir. 2022) (noting federal courts' "limited leeway under AEDPA, and even less when it comes to ineffective assistance claims" in state habeas cases); Civitarese v. Goguen, 410 F. Supp. 3d 303, 318 (D. Mass. 2019) ("The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).").

"The Supreme Court has found an ineffective assistance of counsel claim to be a mixed question of law and fact and is thus to be evaluated under the unreasonable application clause of 28 U.S.C. § 2254." Field, 37 F.4th at 16 n.1 (citing Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009)); see also Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007).

Here, the state court held an evidentiary hearing on Johnson's post-conviction application on January 6, 2020, at which the complaining witness, trial counsel, the prosecuting attorney, and

criminal defense attorney Scott Lutes, Esq.,[6] testified.  Post-
Conv. Decision at 3, 5-6; Tr. of Jan. 6, 2020, Evidentiary Hr'g
("Hr'g. Tr.") 1, 9-10, 36, ECF No. 21-2.  According to the court:

> Attorney McCormick testified that he ha[d] been
> practicing civil and criminal law in Rhode Island for 38
> years.  He began handling criminal matters ten years
> into his practice and so for the last 28 years,
> approximately 50% of his practice consisted of
> litigating criminal cases.  Attorney McCormick testified
> that he has tried an estimated 280 criminal cases and is
> familiar with the concept of suggestive identification.
> In fact, Attorney McCormick testified to his in-depth
> knowledge of suggestive identification after having
> briefed the issue in a separate case before [the R.I.]
> Supreme Court.
>
> Attorney McCormick obtained discovery from the
> State which included the police reports and the photo
> array that was shown to the complaining witness, Ms.
> Celletti.  Attorney McCormick also received the grand
> jury transcript which included Ms. Celletti's testimony
> on how she came to know the name of the defendant.
> During the period of discovery and until the day of
> trial, Attorney McCormick was under the impression that
> Ms. Celletti came to know the suspect's name through a
> disclosure from an unnamed person who may have been a
> clerk at Family Court.  Before the trial, Attorney
> McCormick made no further inquiries of the Attorney
> General's Office, the Family Court, or the complaining
> witness, Ms. Celletti, as to how the name Jody Johnson
> was suggested to her.
>
> With regard to the defense's strategy, Attorney
> McCormick testified that his overall concern was the
> suggestive nature of Ms. Celletti's identification of

---

[6] The post-conviction court allowed Attorney Lutes to testify
provisionally as an expert witness.  Post-Conv. Decision at 6;
Transcript of January 6, 2020.  After hearing argument and
reviewing written memoranda from post-conviction counsel and the
State, the court decided not to consider the testimony of Attorney
Lutes in evaluating the amended post-conviction application and
denied Johnson's motion to admit his expert's testimony.  Id. at
7.

Mr. Johnson. Attorney McCormick explained his
understanding of the law regarding suggestive
identification. He indicated that a two-part analysis
was required: (1) is it a suggestive identification?;
and (2) despite it being suggestive, did the witness
have an adequate opportunity to observe the identity of
the assailant?[7] He opined that in an identification
case, filing a motion to suppress is appropriate
especially when there is no other evidence. However,
Attorney McCormick thought that Ms. Celletti had about
an hour to an hour and a half to observe the assailant
and saw his face up close with adequate lighting. Since
Attorney McCormick thought Ms. Celletti had an adequate
opportunity to observe the assailant, he decided there
was no point in filing a motion to suppress. Although
there was no physical or forensic evidence produced by
the State in this case, Attorney McCormick believed that
it would have been disadvantageous to file a motion to
suppress. He felt as though a motion to suppress would
have been futile, and therefore, decided not to file one
as it could potentially give Ms. Celletti a "dress
rehearsal" on the types of questions Attorney McCormick
would be asking her as a witness at trial. Attorney
McCormick was also of the opinion that one of the reasons
the case was defensible was that a second proposed
witness against Mr. Johnson, the alleged juvenile
participant, who identified Mr. Johnson as a participant
in the robbery in his testimony to the grand jury, was
unavailable to testify at the trial. The State could
not find the juvenile witness prior to the trial, and
therefore, Attorney McCormick thought it was
strategically important not to give the State more time
to find the witness against his client.

Rather than file a motion to suppress, Attorney
McCormick's preferred strategy was to present evidence

---

[7] See State v. Gallup, 89 A.3d 795, 801 (R.I. 2014) (explaining
analysis); see also State v. Texter, 923 A.2d 568, 574 (R.I. 2007)
(listing factors to be considered in assessing reliability of
identification, including: (1) the witness's opportunity to
observe the perpetrator during the commission of the crime; (2)
the level of attention the witness paid to the perpetrator; (3)
the accuracy of the witness's description of the perpetrator; (4)
the witness's degree of confidence in the identification at the
time of confrontation; and (5) the length of time elapsed between
commission of the crime and the confrontation).

of the suggestive identification in order to persuade the jury to give Ms. Celletti's testimony less weight as well as to attack the credibility of her identification. Attorney McCormick considered Ms. Celletti's failure to pick Mr. Johnson's photo out of a photo array which included a picture of Mr. Johnson prior to her hearing the assailant's name from the unnamed person at Family Court or the Attorney General's office to be helpful to the defendant and felt he should emphasize those facts to the jury. The suggestive nature of the conversation identifying Mr. Johnson as a suspect in this case was pointed out by the defense not only to attack Ms. Celletti's credibility, but also to highlight to the jury that Ms. Celletti would be predisposed to identifying whomever she saw on Facebook as the person who robbed her. Consequently, Attorney McCormick chose not to file a motion to suppress Ms. Celletti's identification of Mr. Johnson in favor of the strategy outlined above.

Next to testify was former Special Attorney General, Attorney Ryan Stys (Attorney Stys). Attorney Stys worked as a prosecutor in the Office of the Attorney General for the State of Rhode Island for five years. Attorney Stys was one of the prosecuting attorneys in this matter. Attorney Stys handled the case from some point after the grand jury indictment, working on both the pre-trial and trial stages. Prior to the trial, Attorney Stys reviewed the grand jury transcript, reviewed the discovery, and met with Ms. Celletti. However, Attorney Stys admitted at the evidentiary hearing that he was unable to fully recall how Ms. Celletti originally came to identify Mr. Johnson. Attorney Stys recalled that Ms. Celletti came to learn that Mr. Johnson was a suspect, either through the juvenile proceedings at Family Court or through a telephone conversation with an unnamed individual from the Attorney General's office. Attorney Stys did not remember discussing with Ms. Celletti how she came to identify Jody Johnson prior to the trial.

Post-Conv. Decision at 3-6 (footnote added) (citations omitted).

Although Celletti testified at the post-conviction hearing, Hr'g. Tr. at 1-9, the hearing justice does not summarize her

17

testimony.   Therefore, the Court relies on the transcript of the January 6, 2020, hearing.   Celletti testified, in relevant part, as follows:

> Q   And thinking back to this time, do you remember the first time that you learned the name Jody Johnson?
>
> A   Yes.
>
> Q   And in what context did you learn that name?
>
> A   I believe -- I think it was during a phone conversation with the Attorney General's Office.
>
> Q   Do you remember who initiated that conversation; did you call them or did they call you?
>
> A   I don't remember.
>
> Q   And do you know who you spoke to?
>
> A   All I know is female.
>
> Q   . . .   Do you recall why you came to call the Attorney General's Office or they came to call you?
>
> A   It was regarding one of the other people that robbed my house.
>
> Q   Were you calling to check in on the status of that person's case?
>
> A   Yes --
>
> Q   And --
> A   -- or I had gotten a letter.  I'm not sure because I had -- they called me or I had gotten a letter about the other kid, the minor.
>
> Q   Okay.  And do you remember, you when you spoke to the female at the Attorney General's Office, do you remember if you asked her, Are there any other suspects? Are there any other names?
>
> A   No.

Q    And what do you recall about why she told you a name or in what context she gave you the name Jody Johnson?

A    I believe it was, I said something to the effect of, I wish they could find the adult as quick as they found the kid.

Q    Ok, so you may have said something like that to her, and what was her response, if you remember?

A    I don't recall if she said we know who it is because at that point they hadn't arrested him, but the name, she did say Jody Johnson.

Q    Prior to hearing that name, did you know anyone named Jody Johnson?

A    No.

Q    And prior to trial, did you ever speak to Jim McCormick, who was Mr. Johnson's attorney?

A    I don't remember.

Q    To your recollection, did an investigator from the defense ever come to speak to you?

    THE WITNESS:    What do you mean, the defense?

    MS. NEE:  Like --

A    The police department.  The detectives came out.

Q    And you never had a private investigator who identified themselves as being for the defendant come talk to you?

A    Not that I recall.

Q    And you don't have any memory of speaking to Jim McCormick?

A    Just now in the -- out there, I said hi.

Q    And after you learned the name Jody Johnson from
the Attorney General's office, what did you do?

A    I went on Facebook.

Q    And that's when you identified a picture, correct?

A    Well, I had previously been on Facebook but, yeah.

Q    And what had you previously been doing on Facebook?

A    Going through every one of my kids, especially my
son, because I have a son, their friends' Facebook to
see if I could spot Jody anywhere.  I went through
different profiles to see if I could find him, his face
on anybody that I knew or I was associated with or that
knew me or might know my kids because it was pretty
distinctive.  He was standing a foot from me.

Q    And fair to say your Facebook research, prior to
learning the name Jody Johnson, you did not find a
picture of anyone you thought --

A    No.

. . .

Q    . . . Did you ever remember having a conversation
with Mr. Stys about how you learned the name Jody
Johnson?

          THE WITNESS:   Mr. Stys?

          MS. NEE:  Ryan Stys, the prosecutor.

A    I don't remember, but I'm sure I did.

Q    Do you remember when that conversation was?

A    No.

Q    Do you remember when -- after you found a picture
on Facebook, you called Detective Cute, correct?

A    Yes.

Q    And do you remember when Detective Cute came to your home after that?

A    I was reminded of that today.

Q    So you don't have any?

A    I didn't remember it until it was brought up, and then I do remember it.

Q    So now that I reminded you of that, do you actually remember that?

A    He came in and took a picture of my computer with Jody's profile pulled up.

Q    Do you recall when Detective Cute was in your home that day, you had a conversation with him as to how you learned the name Jody Johnson?

A    I don't recall the whole conversation, but I'm sure I said to him through the Attorney General, and that's how I found out.

Q    Do you remember that?

A    No.

Q    You just assumed you told him that?

A    I called him a lot.  I called him daily.

 . . .

Q    So at what point were you talking to him daily?

A    Before I found out who Jody was.

Q    What was the purpose of those conversations?

A    Have you found him?  Are you looking for him?  Did you get the kid?

Q    Besides Ryan Stys, the prosecutor, do you remember speaking to anyone else in the Attorney General's Office to prepare for trial?

A     I think in the beginning there was a lady.  I don't
know if it was this guy took over for her, but I think
I spoke to a female.

Q     And do you know if that was another attorney?

A     Um-hum.

Q     You believe it was?

A     I think they changed attorneys or something between
the time it happened and the time it went to court.  I
remember a female.

Q     And do you remember telling anyone else affiliated
with  the  Attorney  General's  Office,  I  called  the
Attorney General's Office, and someone gave me the name
Jody Johnson?

A     No.[8]

_____

        8 The Rhode Island Supreme Court's description of Celletti's
trial testimony provides more detail regarding the identification:

        Both Celletti and Det. Cute testified that, a few
    days  after  the  incident,  the  detective  brought  a
    yearbook from the boy's school over to Celletti's house
    and Celletti was able to identify the boy who had been
    in her house the night of the incident.  Both witnesses
    also testified that, two weeks after the incident, Det.
    Cute  brought  over  a  photo  array  which  included
    defendant's photo, but Celletti was unable to identify
    any of the men in the photographs as the man who had
    entered her home on January 28.

        Some  months  after  being  shown  the  photo  array,
    Celletti called the Attorney General's office to inquire
    about the legal proceedings involving the boy.  After a
    brief conversation — the substance of which is not on
    the record — she used her daughter's laptop computer to
    search Facebook for the name "Jodi Johnson."  Celletti
    thought this might have been the name of the third person
    in her house on January 28 whom she had not seen but had
    assumed was a woman based on the voice.  After scrolling
    through  the  various  Jodi  Johnsons  who  came  up  in  the
    Facebook  search  results,  she  looked  at  photos  for
    different spellings of "Jodi."  She testified that, "all

Hrng. Tr. at 3-9 (footnote added).  The State did not cross-examine Celletti.  Id. at 9.

Johnson argues that this identification was "impermissibly suggestive and unreliable," and that trial counsel should have filed a motion to suppress it.  Second Am. Pet. at 6.  Johnson also asserts that trial counsel should have interviewed Celletti, or had an investigator speak with her, regarding the identification.  Id.  By failing to do so, in Johnson's view, trial counsel was ineffective.  Id.

Turning first to the issue of whether trial counsel should have filed a motion to suppress Celletti's identification of Johnson, the post-conviction court stated:  "At issue is whether it was unreasonable for Attorney McCormick not to file a motion to

---

of a sudden [she] saw a picture that was very familiar to [her], but it wasn't a female, it was a male." Celletti testified that, based on the eyes and the large head, "he looked like the man who came into [her] house with a gun." Celletti clicked on the photo, which brought her to that man's Facebook profile page. Celletti scrolled through several photos of this "Jody Johnson," including one in which he was wearing glasses with tape on the corner. When Celletti saw that picture, she was "a hundred percent" certain this photo was of the man who had entered her house on January 28. Celletti called Det. Cute, who testified that he went to her house, watched her repeat the search sequence she had performed on Facebook, and, using his own cell phone camera, took photos of the images on her computer screen. Celletti identified defendant as the man who entered her home and pointed a gun at her face.

Johnson, 199 A.3d at 1049-50 (alterations in original).

suppress the identifications of Mr. Johnson by Ms. Celletti as the person who robbed and assaulted her at her home on January 28, 2014." Post-Conv. Decision 10. Johnson argues that it was unreasonable. The post-conviction court disagreed, concluding that trial counsel's performance was not constitutionally deficient. Id. at 12, 17.

The Court initially observes that the post-conviction court correctly stated established federal law, specifically Strickland, in reaching its decision. See id. at 7-9, 12, 15-16. Further, the post-conviction court did not unreasonably apply Strickland. The post-conviction court noted that trial counsel "weighed the merits of filing a motion to suppress, especially since there was no other evidence available to the State in this case." Id. at 10. The state court continued:

> His principal reason for not filing the motion to suppress was based upon his understanding of the opportunity Ms. Celletti had to observe her assailant — that she had a substantial amount of time to observe the assailant and saw his face up close with adequate lighting. Thus, he felt there was no point in filing a motion to suppress. Rather than file a motion to suppress, Attorney McCormick's preferred strategy was to present evidence of the suggestive identification in order to persuade the jury to give Ms. Celletti's testimony less weight, as well as to attack the credibility of her identification.

> Attorney McCormick's objective was to present the jury with evidence that would allow him to argue that Ms. Celletti's identification of Mr. Johnson should be disregarded. Because he felt a motion to suppress would ultimately have been futile, Attorney McCormick strategically chose not to file one as it could

potentially give Ms. Celletti a "dress rehearsal" on the types of questions he would be asking her on cross-examination.

Id. at 10-11 (citations omitted).

The court subsequently stated:

Attorney McCormick, throughout the trial, meticulously followed his strategy to attack Ms. Celletti's identification of Mr. Johnson as her assailant. In his opening argument, Attorney McCormick emphasized to the jury that the accuracy or inaccuracy of Ms. Celletti's identification was a critical issue in the case. During cross-examination of Ms. Celletti, Attorney McCormick highlighted her inconsistent statements with respect to which side of Mr. Johnson's glasses she claimed to have observed the tape. In his closing argument to the jury Attorney McCormick highlighted the evidence that Ms. Celletti, two weeks after the robbery, failed to pick Mr. Johnson's photograph out of a photo array which, in fact, contained a photograph of Mr. Johnson. Finally, in his closing argument to the jury, Attorney McCormick reiterated that there was no physical evidence produced by the State linking the Petitioner to the crimes with which he was charged, and that the only evidence produced by the State was the suggestive identification made by Ms. Celletti.

Id. at 11-12 (citations omitted).

The post-conviction court found that "the decision whether to file a motion to suppress or not was a tactical one," id. at 16, "based upon informed, professional deliberation," id. at 12. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Strickland, 466 U.S. at 690; see also Martin v. Merrill, Civil No. 07-156-B-W, 2008 WL 114569, at *16 (D. Me. Jan. 9, 2008) ("These excerpts from the evidentiary hearing on the post-

conviction petition demonstrate that [petitioner]'s criminal attorney was making the kind of tough strategic decisions that form the quintessential example of a performance that survives Strickland scrutiny."). Moreover, trial "counsel's performance was not deficient if he declined to pursue a futile tactic." Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) (citing United States v. Wright, 573 F.2d 681, 684 (1st Cir. 1978) ("Counsel is not required to waste the court's time with futile or frivolous motions.")); see also Knight v. Spencer, 447 F.3d 6, 16 (1st Cir. 2006).

Striving "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," Post-Conv. Decision 12 (quoting Tassone, 42 A.3d at 1285), as Strickland requires, 466 U.S. at 689, the post-conviction court specifically found that trial counsel's "tactical decision to forgo the filing of a motion to suppress identification in this case was reasonable 'in view of the totality of the circumstances,'" Post-Conv. Decision 16 (quoting Hazard v. State, 968 A.2d 886, 892 (R.I. 2009)). The post-conviction court concluded:

> Attorney McCormick chose and vigorously pursued a particular trial strategy—the one that he thought gave his client the best chance of success. The Court does not view his strategic decision as an erroneous one, but even if it was, "mere tactical decisions . . . do not by themselves constitute ineffective assistance of counsel."

Id. (alteration in original) (quoting Toole v. State, 748 A.2d 806, 809 (R.I. 2000)); see also id. ("The Court's review of Attorney McCormick's trial strategy will not be distorted by the 20/20 vision of hindsight.").

Although reasonable minds may differ as to whether trial counsel's strategic decision not to file a motion to suppress constituted ineffective assistance, that renders the state court's decision reasonable. See DeCiantis, 868 F. Supp. at 5; see also Flores-Rivera v. United States, 16 F.4th 963, 969 (1st Cir. 2021) ("This court considers a wide range of actions to be reasonable strategy. A decision by counsel that 'prove[s] unsuccessful, or even unwise,' may nevertheless be a reasonable strategic choice." (quoting United States v. Natanel, 938 F.2d 302, 310 (1st Cir. 1991))).

The Court reiterates that it is not its job to determine whether trial counsel rendered ineffective assistance of counsel but rather to determine whether the state court's application of the Strickland standard was reasonable. See Harrington, 562 U.S. at 101; see also Carpio, 269 F. Supp. 3d at 9 ("[I]t is not for this Court to decide whether [petitioner] meets the Strickland standard. In deciding [petitioner]'s habeas petition, this Court instead decides 'whether the state court's application of the Strickland standard was unreasonable.'" (quoting Harrington, 562 U.S. at 101)); see also Lucien v. Spencer, 871 F.3d 117, 131 (1st

Cir. 2017) ("Even if we were to regard such a [strategic] choice as negligent, that would not be nearly enough: Our review of ineffective assistance claims like this one is 'doubly deferential,' requiring [petitioner] to show that counsel's performance was objectively unreasonable <u>and</u> that no reasonable jurist could come to the contrary conclusion the state court drew." (emphasis in original)).  Thus, the Court concludes that the post-conviction court did not unreasonably apply the <u>Strickland</u> standard in this regard.

Trial counsel's reasoning as to whether to interview Celletti was the same as his analysis regarding filing a motion to suppress. The post-conviction court noted trial counsel's concern regarding the suggestiveness of Celletti's identification of Johnson.  Post-Conv. Decision at 15.  The court further stated that:

> Prior to determining his defense strategy, Attorney McCormick reviewed the discovery, researched the issue of identification, obtained the photo array that was shown to Ms. Celletti, reviewed her statements, including the transcripts of her Grand Jury testimony, and reviewed police reports.  . . .  After his investigation Attorney McCormick strategically chose not to file a motion to suppress Ms. Celletti's identification of Mr. Johnson as the perpetrator of the crimes.  This Court is satisfied that had Attorney McCormick or an investigator interviewed Ms. Celletti as part of his investigation it would not have altered his defense strategy.  This Court specifically finds that Mr. McCormick's investigation of the case prior to trial was sufficient and did not constitute ineffective assistance of counsel.

<u>Id.</u> 15–16 (citations omitted).

Again the post-conviction court did not unreasonably apply Strickland with respect to this issue.  The court recognized that "[i]n any claim made regarding the ineffectiveness of defense counsel, 'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"  Id. at 15 (quoting Strickland, 466 U.S. at 691); see also Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."); Lema v. United States, 987 F.2d 48, 55 (1st Cir. 1993) ("The decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent devised in the context of the particular case." (emphasis in original)).  The post-conviction court found that trial counsel's pretrial investigation of the case was sufficient and did not constitute ineffective assistance of counsel.  Post-Conv. Decision 15-16; see also Rice v. State, 38 A.3d 9, 18 (2012) ("[T]he lens under which this Court examines constitutionally defective representation under Strickland is one of reasonable competency of assistance.  Under [this] reasonably

competent assistance standard, effective representation is not the same as errorless representation. Thus, a choice between trial tactics, which appears unwise only in hindsight, does not constitute constitutionally deficient representation under th[is] . . . standard." (internal quotation marks omitted) (citations omitted)).

In closing, the post-conviction court stated:

> In look[ing] at the entire performance of counsel, the Court is satisfied that Petitioner received effective assistance of counsel. The Court cannot conclude that Attorney McCormick's performance was deficient in that it fell below an objective standard of reasonableness. . . . This Court is satisfied that Attorney McCormick's trial performance certainly fell within the wide range of reasonable professional assistance to which Petitioner was entitled.[9]

Id. at 17 (footnote added) (alterations in original) (internal quotation marks omitted) (citations omitted). For its part, this Court cannot say that the state court's conclusion was unreasonable or that fair-minded jurists could not disagree regarding its reasonableness. See Harrington, 562 U.S. at 101.

B.   Brady Violation

Johnson further claims that the State failed to disclose exculpatory evidence in violation of his due process rights and the Supreme Court's decision in Brady v. Maryland. Second Am.

---

[9] Because the post-conviction court found that Johnson had not satisfied the performance prong of Strickland, it declined to address the prejudice prong. Post-Conv. Decision 18.

Pet. 3.  The exculpatory evidence at issue is the fact that the complaining witness learned Johnson's identity from someone in the Attorney General's Office and that this information was not disclosed to the defense prior to the commencement of trial.

> In Brady, the Supreme Court held that the government's suppression of evidence favorable to the accused violates due process if the evidence is material to guilt or punishment.  To prevail on a Brady claim, "petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)."

Bucci v. United States, 662 F.3d 18, 38 (1st Cir. 2011) (quoting Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005)); see also Flores-Rivera, 16 F.4th at 968 (summarizing Brady standard). "To satisfy the prejudice (i.e., or materiality) prong of the Brady analysis, the petitioner must show there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Bucci, 662 F.3d at 38 (quoting Strickler v. Greene, 527 U.S. 263, 280 (1999)); see also Barrett v. United States, 965 F.2d 1184, 1189 (1st Cir. 1992) ("The materiality test under Brady is not met unless the nondisclosure of the evidence 'undermine[s] confidence in the outcome of the trial,' which can occur only if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting United States v. Bagley, 473 U.S. 667, 682

(1985) (alteration in original) (citation omitted))).   The Rhode Island Supreme Court has stated that its "jurisprudence provides even greater protection to criminal defendants than the one articulated [by the United States Supreme Court]."   Tempest v. State, 141 A.3d 677, 683 (R.I. 2016) (alteration in original) (internal quotation marks omitted).

As before, the post-conviction court correctly stated and analyzed Johnson's claim using established federal law, in this case the Supreme Court's decision in Brady.   See Post-Conv. Decision 18-21.   The court found that Johnson had "failed to meet his burden of proving his claim that his constitutional due process rights under the Fifth and Fourteenth Amendments of the United States Constitution were violated as the prosecution did not fail to disclose material evidence to the Petitioner as interpretated by Brady."   Id. at 22.   The court was "not convinced that any Brady violations [had] occurred."   Id. at 20.   It found that "[t]he evidence cited by the Petitioner in his allegation of Brady violations was not material either to guilt or punishment," id. at 21, despite its recognition of the impeachment value of the evidence, id. at 20 (noting that "the evidence as to how Ms. Celletti learned that Mr. Johnson was a suspect in the robbery could certainly be (and was) used to impeach Ms. Celletti's identification of Mr. Johnson . . .").   It did not appear to the post-conviction court that the State had suppressed the evidence,

id. ("At best, there was a late disclosure by the State on the day of trial."), or that the State "acted deliberately in withholding this information from the defense," id. at 20-21 (noting that the State produced the corrected evidence to trial counsel, albeit shortly before trial, "presumably in compliance with its obligations under Brady"). Finally, the post-conviction court was "not convinced that the State's allegedly late disclosure had any impact whatsoever on Attorney McCormick's trial strategy, nor did it affect the outcome of the trial." Id. at 21; see also id. at 20 (noting that "the corrected information did not alter Attorney McCormick's considered trial strategy not to file a motion to suppress."). Rather, trial counsel "utilized this evidence in presenting his defense during both cross-examination and during closing argument in an effort to convince the jury that the identification was suggestive and should be given little or no weight." Id. at 21.

Given the deference that this Court must afford to state court rulings under § 2254(d) — although not unlimited — the Court cannot say that the R.I. Superior Court's decision was an unreasonable application of Brady.

> Relief pursuant to 28 U.S.C. § 2254(d)(1) is not called for when this court might merely have a different opinion as to how things should have turned out. To the contrary, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate it is outside the universe

33

of plausible, credible options.  This is a high hurdle
. . . .

Hensley, 755 F.3d at 737 (citation omitted) (internal quotation
marks omitted).  Johnson has not surmounted that hurdle.

IV.  CONCLUSION

Based on the foregoing, the Court GRANTS the State's Motion
to Dismiss, ECF. No. 21, and DENIES and DISMISSES Johnson's Second
Amended Petition, ECF No. 19.

<u>RULING ON CERTIFICATE OF APPEALABILITY</u>

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability (COA) because Johnson failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. § 2253(c)(2). Johnson is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter. <u>See</u> Rule 11(a), Rules Governing Section 2254 Cases.

IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date:  February 13, 2023